## Case No. 16,726.

UNITED STATES ex rel. WHEELER v. WILLIAMSON.

[4 Am. Law Reg. 5; 5 Pa. Law J. Rep. 377.]

District Court, E. D. Pennsylvania. Oct. 12, 1855.

HABEAS CORPUS TO RELEASE SLAVES—MOTION TO QUASH—CONTEMPT.

1. The doctrines laid down in Case No. 16,725 reaffirmed.

2. Where a habeas corpus is issued by a master on behalf of slaves alleged to have been carried away by force from him, and the defendant is committed for a contempt in not making a proper return to the writ, the court will not entertain a motion to quash the proceedings upon the petition and suggestion of one of the negroes that she is and was absenting herself from her master voluntarily, and that she is not nor ever was in the custody, possession, power, or control of the defendant; such slave not coming or being brought personally within the jurisdiction, or before the court, in order to make the application.

[Cited in Ex parte Des Rochers, Case No. 3,-824.]

After the proceedings in this case as reported [Case No. 16,725], no further steps were taken in this court on the part of the defendant, until Wednesday, October 3, 1855, when Mr. Townsend and Mr. John M. Read, presented to the court a paper purporting to be "the suggestion and petition of Jane Johnson;" on which they moved for a rule to show cause why the writ of habeas corpus, issued against Passmore Williamson, should not be quashed. The paper in question was in the following form:

"To the Honorable John K. Kane, Judge of the Aforesaid Court: The suggestion and petition of Jane Johnson, respectfully showeth: That she is one of the three parties named in the aforesaid writ of habeas corpus, and the mother of the two children Daniel and Isaiah, also named therein, and thereby required to be produced. That before the occurrences hereinafter stated, this petitioner and her said two children lived in Washington, in the District of Columbia, and were claimed and held by the said John H. Wheeler as his slaves, according to the laws and usages of that District. That on the 18th day of July, 1855, the said John H. Wheeler, voluntarily brought your petitioner and her two children from the city of Washington to the city of Philadelphia, passing through Baltimore, and reaching Philadelphia by way of the Philadelphia, Wilmington and Baltimore Railroad. Mr. Wheeler stopped at Bloodgood's Hotel, in Philadelphia, at the foot of Walnut street, and fronting on the Delaware river, and remained there with your petitioner and her said two children, from about 2 o'clock, p. m., until shortly before 5 o'clock, p. m., when he directed your petitioner to bring her children and accompany him on board a steamboat belonging to the railroad line to New York, which boat was then being attached to the pier in front of the said hotel; which direction was complied with, and your petitioner seated herself with her said two children, on the upper deck of the said boat, near Mr. Wheeler. Your petitioner was very desirous of procuring the freedom of herself and her children, and before she left Washington determined to make an effort to do so, if said Wheeler should take her north. While stopping at the hotel as aforesaid, Mr. Wheeler went to dinner; and while your petitioner was absent from his presence, she informed one of the waiters at the said hotel (a colored woman) that she and her children were slaves. A few minutes before 5 o'clock, while said Wheeler, your petitioner, and her children were on the upper deck of the steamboat as aforesaid, a white gentleman, whose name your petitioner has since been informed is Passmore Williamson, approached your petitioner, and informed her that she was free if she chose to claim her liberty, and asked her if she desired to be free. Your petitioner replied that she did wish to be free, as in truth and in fact she did; and said Williamson then further informed your petitioner that if she wished her liberty, she could go ashore and take her children with her, and that no one had a right to prevent her doing so; but that she must decide promptly whether she would go or stay, as the boat would soon start. Your petitioner being desirous to go on shore, rose to go, and was taken hold of by said Wheeler, who urged her to stay with him; but your petitioner refused to stay, and voluntarily and most willingly left the boat, aided in the departure by several colored persons, who took her children with her consent, and led or carried them off the boat, and conducted your petitioner and her said children to a carriage a short distance from the boat, which carriage they entered, and went away. Mr. Williamson did not accompany the colored persons who were assisting your petitioner to get away, but remained some distance behind; and your petitioner has never seen him since she left the steamboat as aforesaid. Your petitioner further states, that she was not at the time of her leaving Mr. Wheeler as aforesaid, or at any time since, in any way or manner whatever in the custody, power, possession or control of Mr. Williamson, nor has she received from him any directions or instructions, directly or indirectly, whither she should go. But claiming and believing that she and her children are free, your petitioner has ever since her leaving said Wheeler, exercised her right, as a free woman, to go whither she pleased, and to take her said children, and has not since that time been restrained of her liberty by any person whatever. Your petitioner is advised, and respectfully submits to your honor, that the said writ of habeas corpus ought to be quashed under the facts above stated, and for the following, among other reasons: First, the said Wheeler had no control over or right to the possession of your petitioner or her said children at the issuing of the aforesaid writ, they being then free; second, because the said writ was issued without the knowledge or consent of your petitioner, and against her wish; third, because in truth and in fact, at the issuing of the said writ and at all times since your petitioner left the company of said Wheeler as aforesaid, neither she nor her said children have been detained or restrained of their liberty by said Williamson or any other person whatever; fourth, because under the writ of habeas corpus, which is a writ devised and intended to restore freemen to liberty when unduly restrained thereof, the said John H. Wheeler seeks to reclaim and recover your petitioner and her said children, and reduce them again into slavery. Wherefore, your petitioner respectfully prays this honorable court, that the said writ of habeas corpus and all proceedings under it, may be quashed, and especially that the said Passmore Williamson may be discharged from his imprisonment.                     her

Jane   X  Johnson.
mark.

"United States of America, District of Massachusetts: On this twenty-sixth day of September, A. D. 1855, the above named Jane Johnson, personally appearing, made solemn oath that the facts stated in the foregoing petition, so far as they are written of her own knowledge, are true, and all other facts therein stated, she believes to be true. Before me,
"C. W. Loring,
"Com. U. S. Court Dist. Massachusetts."

Upon the motion being made, Judge KANE expressed a doubt whether he could properly

entertain it, inasmuch as it did not appear that Jane Johnson had a status in the court. This question was then partially argued by Mr. Read; and on the Monday and Tuesday following, it was discussed very fully by both the counsel.

KANE, District Judge. Before entering upon the question immediately before me at this time, it is proper that I should advert to the past action of this court in the case of Passmore Williamson, and to the considerations that led to it. I do this the rather, because in some of the judicial reviews to which it has been submitted collaterally, after an ex parte argument it does not seem to me to have been fully apprehended. I begin with the writ which originated the proceeding.

The writ of habeas corpus is of immemorial antiquity. It is deduced by the standard writers on the English law from the great charter of King John. It is unquestionable, however, that it is substantially of much earlier date; and it may be referred without improbability, to the period of the Roman invasion. Like the trial by jury, it entered into the institutions of Rome before the Christian era, if not as early as the times of the republic. Through the long series of political struggles which gave form to the British constitution, it was claimed as the birthright of every Englishman, and our ancestors brought it with them as such to this country. At the common law, it issued whenever a citizen was denied the exercise of his personal liberty, or was deprived of his rightful control over any member of his household, his wife, his child, his ward, or his servant. It issued from the courts of the sovereign, and in his name, at the instance of any one who invoked it, either for himself or another. It commanded, almost in the words of the Roman edict,—"De libero homine exhibendo" (D. 43, T. 29),—that the party under detention should be produced before the court, there to await its decree. It left no discretion with the party to whom it was addressed. He was not to constitute himself the judge of his own rights or of his own conduct; but to bring in the body, and to declare the cause wherefore he had detained it; and the judge was then to determine whether that cause was sufficient in law or not. Such in America, as well as England, was the well known, universally recognized writ of habeas corpus.

When the federal convention was engaged in framing a constitution for the United States, a proposition was submitted to it by one of the members, that "the privileges and benefits of the writ of habeas corpus shall be enjoyed in this government in the most expeditious and ample manner; and shall not be suspended by the legislature except upon the most urgent and pressing occasions." See the Madison Papers (vol. 3, p. 1365). The committee to whom this was referred for consideration, would seem to have regarded the privilege in question as too definitely implied in the idea of free government to need formal assertion or confirmation; for they struck out that part of the proposed article in which it was affirmed, and retained only so much as excluded the question of its suspension from the ordinary range of congressional legislation. The convention itself must have concurred in their views; for in the constitution, as digested, and finally ratified, and as it stands now, there is neither enactment nor recognition of the privilege of this writ, except as it is implied in the provision that it shall not be suspended. It stands then under the constitution of the United States, as it was under the common law of English America, an indefeasible privilege, above the sphere of ordinary legislation.[1] I do not think it necessary to argue from the words of this article, that the congress was denied the power of limiting or restricting or qualifying the right, which it was thus forbidden to suspend. I do not, indeed, see that there can be a restriction or limitation of a privilege which may not be essentially a suspension of it, to some extent at least, or under some circumstances, or in reference to some of the parties who might otherwise have enjoyed it. And it has appeared to me, that if congress had undertaken to deny altogether the exercise of this writ by the federal courts, or to limit its exercise to the few and rare cases that might peradventure find their way to some one particular court, or to declare that the writ should only issue in this or that class of cases, to the exclusion of others in which it might have issued at the common law, it would be difficult to escape the conclusion, that the ancient and venerated privilege of the writ of habeas corpus had not been in some degree suspended, if not annulled. But there has been no legislation or attempted legislation by congress, that could call for an expansion of this train of reasoning. There was one other writ, which, in the more recent contests between the people and the king, had contributed signally to the maintenance of popular right. It was the writ of scire facias, which had been employed to vindicate the rights of property, by vacating the monopolies of the crown. Like the writ of habeas corpus, it founded itself on the concessions of Magna Charta; and the two were the proper and natural complements of each other. The First congress so regarded them. The protection of the citizen against arbitrary exaction and unlawful restraint, as it is the essential object of all rightful government, would present itself as the first great duty of the courts of justice that were about to be constituted. And if, in defining their ju-

---

[1] "The privilege of the writ of habeas corpus shall not be suspended unless when in cases of rebellion or invasion the public safety may require it." Const. U. S. art. 1, § 9, par. 1.

risdiction, it were thought proper to signalize two writs, out of the many known to the English law, as within the unqualified competency of the new tribunals, it would seem natural that those two should be selected, which boasted their origin from the charter of English liberties, and had been consecrated for ages in the affectionate memories of the people as their safeguard against oppression. This consideration has interpreted for me the terms of the statute, which define my jurisdiction on this subject. Very soon after I had been advanced to the bench, I was called upon to issue the writ of habeas corpus, at the instance of a negro, who had been arrested as a fugitive from labor. It was upon the force of the argument, to which I now advert, that I then awarded the process; and from that day to this, often as it has been invoked and awarded in similar cases that have been before me, my authority to award it has never been questioned.

The language of the act of congress reflects the history of the constitutional provision. It enacts [1 Stat. 81] "that all the before mentioned courts . of the United States" (the supreme, circuit and district) "shall have power to issue writs of scire facias, habeas corpus and all other writs not specially provided for by statute which may be necessary for the exercise of their respective jurisdictions and agreeable to the principles and usages of law." I am aware that it has sometimes been contended or assumed, without, as it seems to me, a just regard to the grammatical construction of these words, that the concluding limitation applies to all the process of the courts, the two writs specially named among the rest; and that the federal courts can only issue the writ of habeas corpus, when it has become necessary to the exercise of an otherwise delegated jurisdiction; in other words, that it is subsidiary to some original process or pending suit. It is obvious, that if such had been the intention of the law-makers, it was unnecessary to name the writ of habeas corpus at all; for the simpler phrase, "all writs necessary, &c." would in that case have covered their meaning. But there are objections to this reading more important than any that found themselves on grammatical rules. The words that immediately follow in the section, give the power of issuing the writ to every judge, for the purpose of inquiring into the causes of a commitment. Now, a commitment presupposes judicial action, and this action it is the object of the writ to review. Can it be, that a single judge, sitting as such, can re-examine the causes of a detainer, which has resulted from judicial action, and is therefore prima facie a lawful one; and yet that the court, of which he is a member, cannot inquire into the causes of a detainer, made without judicial sanction, and therefore prima facie unlawful? Besides, if this were

the meaning of the act, it might be difficult to find the cases to which it should apply. I speak of the writ of habeas corpus ad subjiciendum, the great writ of personal liberty, referred to in the constitution; not that modification of it which applies specially to the case of a commitment. nor the less important forms of habeas corpus, ad respondendum, ad faciendum, &c., which are foreign to the question. I do not remember to have met a case, either in practice or in the books, where the writ ad subjiciendum could have performed any pertinent office in a pending suit. There may be such, but they do not occur to me; and I incline very strongly to the opinion, that if the power to issue the writ of habeas corpus applies only to cases of statutory jurisdiction, outrages upon the rights of a citizen can never invoke its exercise by a federal court. If such were indeed the law of the United States, I do not see how I could escape the conclusion, that the jealousy of local interests and prejudice, which led to the constitution of federal courts, regarded only disputes about property; and that the liberty of a citizen, when beyond the state of his domicil, was not deemed worthy of equal protection. From an absurdity so gross as this, I relieve myself by repeating the words of Chief Justice Marshall, in Ex parte Watkins, 3 Pet. [28 U. S.] 201: "No law of the United States prescribes the cases in which this great writ shall be issued, nor the power of the court over the party brought up on it." Whether, then, I look to the constitution, and its history, or to the words or the policy of the act of congress, I believe that it was meant to require of the courts of the United States, that they should dispense the privileges of the writ of habeas corpus to all parties lawfully asserting them, as other courts of similar functions and dignity had immemorially dispensed them at the common law. The congress of 1789 made no definition of the writ, or of its conditions, or effects. They left it as the constitution left it, and as it required them to leave it, the birthright of every man within the borders of the states; like the right to air, and water, and motion, and thought, rights imprescriptible, and above all legislative discretion or caprice. And so it ought to be. There is no writ so important for good, and so little liable to be abused. At the worst, in the hands of a corrupt or ignorant judge, it may release some one from restraint who should justly have remained bound. But it deprives no one of freedom, and devests no right. It could not give to Mr. Wheeler the possession of his slaves, but it might release them from the custody of a wrong-doer. Freemen or bondsmen, they had rights; and the foremost of these was the right to have their other rights adjudicated openly and by the tribunals of the land. And this right at least, Mr. Wheeler shared with them; he also could claim a hearing.

Unless these views are incorrect. through-

out, the district court had jurisdiction of the case, which came before it at the instance of Mr. Wheeler. He represented in substance, by his petition under oath, that three human beings had been forcibly taken possession of by Passmore Williamson, without authority of law, within the Eastern district of Pennsylvania; and he prayed, that by force of the writ of habeas corpus, Mr. Williamson might be required to produce their bodies before the court, and to declare what was the right or pretext of right, under which he claimed to detain them. Whether Mr. Wheeler was in fact entitled to demand this writ, or whether upon a full discussion of the law the court might have felt justified in refusing it to him, is a question of little moment. Every day and in every court, writs issue at the instance of parties asserting a grievance, and very often when in truth no grievance has been sustained. The party assailed comes before the court in obedience to its process. He perhaps questions the jurisdiction of the court. Perhaps he denies the fact charged. Perhaps he explains that the fact, as charged, was by reason of circumstances a lawful one. The judge is not presumed to know beforehand, all the merits of the thousand and one causes that come before him: he decides when he has heard. But the first duty of a defendant, in all cases, is obedience to the writ which calls him into court. Till he has rendered this, the judge cannot hear the cause, still less pass upon its merits. Mr. Williamson came before the court; but he did not bring forth the bodies of his alleged prisoners, as the writ had commanded him. He did not question the jurisdiction of the court: he did not assert that the negroes were free, and that the writ had been applied for without their authority or consent: but he simply denied that they had ever been in his custody, power or possession, as Mr. Wheeler asserted. Witnesses were heard, and, with one consent, they supported the allegations of Mr. Wheeler, and contradicted the denial of Mr. Williamson. Mr. Williamson's counsel then asked time to enable them to produce witnesses who were material on his behalf; remarking that their client might desire to bring the negroes into court, to prove that they had not been abducted. The judge informed them, in reply, that upon Mr. Williamson making the customary affidavit that there were material witnesses whom he wished to adduce, the cause would be continued, as of course, till a future day. Mr. Williamson declined making the affidavit. He however asked leave to declare for himself what he had done, and why. He was heard, and, speaking under solemn affirmation, he not only verified all the important facts that had been sworn to by Mr. Wheeler and the witnesses, but added that immediately before coming into court with his return, he had called upon a negro who had

been his principal associate in the transaction, to ascertain whether the negroes were "safe," and had been informed by him that they were "all safe." Two motions were then made by Mr. Wheeler's counsel; the first, that Mr. Williamson should be committed for a contempt of process, in that he had made a false return to the writ; the second, that he should be held to answer to a charge of perjury. He summed up the evidence, and referred to authorities in support of these motions. The counsel of Mr. Williamson then asked leave to consult together as to their appropriate course of action: and this being assented to by the court, they retired with their client for the purpose, from the court room. Returning after some time, they informed the court that they declined making any argument upon the questions which were before it. The case, which was in this manner thrown upon the court for its unaided adjudication, had assumed an aspect of grave responsibility on the part of Mr. Williamson. It was clearly in proof that the negroes had been removed by persons acting under his counsel, in his presence, and with his co-operation: his return to the writ denied that they had ever been within his possession, custody, or control. Under ordinary circumstances, this denial would have been conclusive; but being controverted by the facts in evidence, it lost that character. "The court," said Judge Story, in a case singularly analogous in its circumstances,—U. S. v. Green [Case No. 15,-256],—"will not discharge the defendant, simply because he declares that the infant is not in his power, possession, control or custody, if the conscience of the court is not satisfied that all the material facts are fully disclosed. That would be to listen to mere forms, against the claims of substantial justice, and the rights of personal liberty in the citizen. In ordinary cases, indeed, such a declaration is satisfactory and ought to be decisive, because there is nothing before the court upon which it can ground a doubt of its entire verity, and that in a real and legal sense the import of the words 'possession, power, or custody,' is fully understood and met by the party. The cases of Rex v. Winton, 5 Term R. 89, and of Stacy, 10 Johns. 328, show with what jealousy courts regard returns of this nature. In these cases, there was enough on the face of the returns to excite suspicions that more was behind, and that the party was really within the constructive control of the defendant. Upon examining the circumstances of this case, I am not satisfied that the return contains all those facts within the knowledge of the defendant, which are necessary to be brought before the court, to enable it to decide, whether he is entitled to a discharge; or in other words, whether he has not now the power to produce the infant, and control those in whose custody she is." "There is no doubt," he adds, "that an attachment is

the proper process to bring the defendant into court." Anxious that this resort to the inherent and indispensable powers of the court might be avoided. the judge, in adjourning the case for advisement until the following week, urged upon Mr. Williamson and his associates, that if practicable, the negroes should, in the meantime. be brought before the court. But the negroes were not produced. They came forward afterwards, some of them, as it is said, before a justice in New York; and by a process of a Pennsylvania state court, they or some of them were brought forward again in this city, to testify for Mr. Williamson or some of his confederates. But before the court of the United States, sitting within the same curtilage, at the distance of perhaps a hundred yards, it was not thought necessary or expedient or practicable to produce them. Their evidence, whatever might have been its import or value, was never before the court. and could have no bearing upon its action. The decision was announced at the end of the week. It was, that Mr. Williamson's answer was evasive and untrue; that he, therefore, had not obeyed the writ of habeas corpus, and must consequently stand committed as for a contempt of it. The order to that effect having been made, a discussion arose between the counsel as to the propriety of certain motions, which on one side and the other they invited the court to consider. It was apparent, that the learned gentleman who at this time addressed the court on behalf of Mr. Williamson, as his senior counsel, was imperfectly prepared to suggest any specific action either for the bench. or for his client. His remarks were discursive; and when invited to reduce his motion to writing, according to the rules of practice, he found difficulty in defining its terms. This led to an intimation on the part of the judge, that, inasmuch as the opinion was in writing, and would be printed in the newspapers of the afternoon, it might be best for the counsel to examine its positions before submitting their motion. The intimation was received courteously. The question was asked whether the court would be in session on one or another of days that were named; and the reply was given, that upon a note being left at the clerk's office at any time, the judge would be in attendance to hear and consider whatever motions the counsel might see proper to lay before him. This was the last of the case. No motion was. made; no further intimation given on the part of Mr. Williamson or his counsel. of a wish to make one.

Commitments for contempt, like the contempts themselves, may be properly distributed in two classes. Either they are the punishment for an act of misconduct, or it is their object to enforce the performance of a duty. The confinement in the one case is for a fixed time, supposed to be commensurate with the offending; in the other, it is without prescribed limitation, and is determined by the willingness of the party to submit himself to the law. In the case of Mr. Williamson, the commitment is for a refusal to answer; that is to say, to make a full and lawful answer to the writ of habeas corpus, an answer setting forth all the facts within his knowledge, which are necessary to a decision by the court, "whether he had not the power to produce the negroes, and control those in whose custody they were." He is now undergoing restraint, not punishment. Immediately after the opinion was read, he was informed, in answer to a remark from his counsel, that the commitment was "during the contempt:" the contempt of the party and the order of the court consequent upon it, determine together.

This is all that I conceive it necessary to say of the strictly judicial action in the case. The opinions, announced by the judge upon other points, may perhaps be regarded as merely dicta. But it had appeared from the defendant's declarations when upon the stand, that he supposed Mr. Wheeler's slaves to have become free, and that this consideration justified his acting towards them as he had done. It seemed due to him, that the court. believing as it did those views to be incorrect, should not withhold an expression of its dissent from them. Several succinct positions were accordingly asserted by the judge: two of which may invite a few additional remarks at this time. "I know of no statute of Pennsylvania," the judge said. "which affects to divest the rights of property of a citizen of North Carolina, acquired and asserted under the laws of that state, because he has found it needful or convenient to pass through the territory of Pennsylvania; and I am not aware that any such statute, if such a one were shown, could be recognized as valid in a court of the United States." The first of these propositions may be vindicated easily. By the common law, as it came to Pennsylvania, slavery was a familiar institution. Only six days after the first legislative assembly met in Philadelphia, and thirteen days before the great charter was signed, the council was engaged in discussing a law "to prevent the escape of runaways;" and four days later, it sat judicially, William Penn himself presiding, to enforce a contract for the sale of a slave. 1 Colonial Records, 63.[2] The counties

---

[2] "At a council, held at Philadelphia, ye 29th 1st mo., 1683. Present. William Penn, proprietary, and governor of Pennsylvania and. counties annexed, Thos. Holmes, John Richardson, William Clarke, John Simcox, James Harrison. (and eight others.) The petition of Nathaniel Allen was read, shewing that he had sould a servant to Henry Bowman. for six hundred weight of beefe, with ye hide and tallow, and six pounds sterling, which ye said Bowman delayed to pay ye said petitioner, showing likewise that ye said Henry Bowman and Walter Humphrey hired a boat of the said petitioner only for one month, and kept the same boat 18 weeks from the petitioner to his great prejudice: Then it was ordered, that William Clarke, John Simcox and James Harrison should speak to Henry Bowman concerning this matter."—Page 62. The great charter was signed by William Penn,

of New Castle, Kent, and Sussex, which were at that time and for many years after annexed to Pennsylvania, and governed by the same law, continue to recognize slavery up to the present hour. It survived in our commonwealth, as a legally protected institution, until some time after the census of 1840; so cautiously did the act of 1780, for its gradual abolition among us, operate upon the vested interests of our own slave owners. That act excepted from the operation of its provisions the domestic slaves of delegates in congress, of foreign ministers, of persons passing through, or sojourning in the state, and not becoming residents therein, provided such slaves were not retained in the state longer than six months. The act of 1847 repealed so much of the act of 1780 as authorized masters and owners of slaves to bring and retain their slaves within the commonwealth for the period of six months, or for any period of time whatever. But it did not affect to vary or rescind the rights of slave owners passing through our territory. It applied to persons resident and persons sojourning, who brought and sought to retain their slaves here; for over such persons and their rights of property the state had lawful dominion: but it left the right of transit for property and person, over which it had no jurisdiction, just as it was before, and as it stood under the constitution of the United States and the law of nations.

This brings me to the second part of the position affirmed in the court's opinion, namely: the right of a citizen of one state to pass freely with his slaves through the territory of another state, in which the institution of slavery is not recognized. I need not say, that before the compact of union was formed between the states, each of them was an absolutely sovereign and independent community; and that, except so far as their relations to each other and to foreign nations have been qualified by the federal constitution, each of them remain so. As such, it is bound by that great moral code, which, because of its universal obligation, is called the "law of nations." What it could not do if freed from federative restrictions, it cannot do now: every restraint upon its policy, which duty to other states would in that case involve, binds it still, just as if the Union had been dissolved or had never been formed. All the statists unite in regarding the right of transit for person and property through the territory of a friendly state, as among those which cannot, under ordinary circumstances, be denied.

2d day, 2d mo., 1683. See page 72. A practice analogous to the fugitive slave law of modern times seems to be referred to in the following minute, at page 147 of the same volume. "24th 5 mo., 1685. William Hague requests the secretary, that an hue and cry from East Jersey after a servant of Mr. John White's, a merchant at New York, might have some force and authority to pass this province and territories: The secretary indorsed it, and sealed it with ye seal of this province."

Vattel, bk. 2, c. 10, §§ 132–134; Puffendorf, bk. 2, c. 3, §§ 5, 67, Ruth. Inst. bk. 2, c. 9; 1 Kent, Comm. 33, 35. It is true that the right is not an unqualified one. The state may impose reasonable conditions upon its exercise, and exact guaranties against its abuse. But subject to these limitations, it is the right of every citizen of a friendly state. The right is the same, and admits just the same qualifications, as to person and to property. The same argument, that denies the right of peacefully transmitting one's property through the territories of a state, refuses the right of passage to its owner. And the question, what is to be deemed property in such a case, refers itself necessarily to the law of the state from which the citizen brings it: a different test would sanction the confiscation of property at the will of the sovereign through whose territory it seeks to pass. If one state may decree that there shall be no property, no right of ownership in human beings; another, in a spirit of practical philanthropy only a little more energetic, may deny the protection of law to the products of slave labor; and a third may denounce a similar outlawry against all intoxicating liquids. And if the laws of a state can control the rights of property of strangers passing through its territory; then the sugar of New Orleans, the cotton of Carolina, the wines of Ohio, and the rum of New England may have their markets bounded by the states in which they are produced; and without any change of reasoning, New Jersey may refuse to citizens of Pennsylvania the right of passing along her railroads to New York. The doctrine is one that was exploded in Europe more than four hundred and fifty years ago, and finds now, or found very lately, its parting illustration in the politics of Japan. It was because, and only because, this right was acknowledged by all civilized nations, and had never been doubted among the American colonies—because each colony had at all times tendered its hospitalities freely to the rest, cherishing that liberal commerce which makes a brotherhood of interest even among alien states; it was because of this, that no man in the convention or country thought of making the right of transit a subject of constitutional guaranty. Everything in and about the constitution implies it. It is found in the object, "to establish a more perfect union," in the denial to the states of the power to lay duties on imports, and in the reservation to congress of the exclusive right to regulate commerce among the states. This last power of the general government according to the repeated and well considered decisions of the supreme court of the United States, from Gibbons v. Ogden, 9 Pet. [34 U. S.] 1, to the Passenger Cases, 7 How. [48 U. S.] 283, applies to intercourse as well as navigation, to the transportation of men as well as goods, of men who pass from state to state involuntarily, as of men who pass voluntarily; and it ex-

cludes the right of any state to pass laws regulating, controlling, or a fortiori, prohibiting such intercourse or transportation. I do not quote the words of the eminent judges who have affirmed this exposition of the constitution; but it is impossible to read their elaborate opinions, as they are found in the Reports, without recognizing this as the fixed law of the United States. It needs no reference to disputable annals, to show that when the constitution was formed in 1787, slaves were recognized as property, throughout the United States. The constitution made them a distinct element in the distribution of the representative power and in the assessment of direct taxes. They were known and returned by the census, three years afterwards, in sixteen out of the seventeen states then embraced in the Union; and as late as the year 1830, they were found in every state of the original thirteen. How is it possible then, while we assert the binding force of the constitution by claiming rights under it, to regard slave property as less effectively secured by the provisions of that instrument than any other property which is recognized as such by the law of the owner's domicil? How can it be, that a state may single out this one sort of property from among all the rest, and deny to it the right of passing over its soil—passing with its owner, parcel of his travelling equipment, as much so as the horse he rides on, his great coat, or his carpet bag? We revolt in Pennsylvania, and honestly no doubt, at this association of men with things as the subjects of property; for we have accustomed ourselves for some years—now nearly fifteen—to regard men as men, and things as things: sub modo, however; for we distinguish against the negro much as our forefathers did; and not perhaps with quite as much reason. They denied him civil rights, as a slave: we exclude him from political rights, though a freeman. Yet no stranger may complain of this. Our constitutions and statutes are for ourselves, not for others. They reflect our sympathies, and define our rights. But as to all the rest of the world; those portions especially, towards whom we are bound by the "supreme law" of the federal constitution; they are independent of our legislation, however wise or virtuous it may be; for they were not represented in our conventions and assemblies, and we do not permit them to legislate for us. Whether any redress is provided by the existing laws of Pennsylvania for the citizen of another state, whose slaves have escaped from him while he was passing through our territory, it is not my province to inquire. It is quite probable that he may be denied recourse to the courts, as much so as the husband, or father, or guardian, whose wife, or child, or ward, has run away. He may find himself referred back to those rights, which annex themselves inseparably to the relation he occupies, the rights of manucaption and detainer. These, I apprehend that he may assert and exercise anywhere, and with such reasonable force as circumstances render necessary. And I do not suppose that the employment of such reasonable force could be regarded as a breach of the peace, or the right to employ it as less directly incident to his character of master than it might be to the corresponding character in either of the analogous relations. In a word, I adopt fully on this point the views so well enforced by Judge Baldwin, in the case of Johnson v. Tompkins [Case No. 7,416]: "The right of the master to arrest his fugitive slave, is not a solitary case in the law. It may be exercised towards a fugitive apprentice or redemptioner to the same extent, and is done daily without producing any excitement. An apprentice is a servant, a slave is no more: though his servitude is for life. the nature of it is the same as apprenticeship or by redemption, which, though terminated by time, is during its continuance as severe a servitude as that for life. Of the same nature is the right of a parent to the services of his minor children. which gives the custody of their persons. So, where a man enters bail for the appearance of a defendant in a civil action, he may seize his person at his pleasure, and commit him to prison; or, if the principal escapes, the bail may pursue him to another state, arrest, and bring him back, by the use of all necessary force and means of preventing an escape. The lawful exercise of this authority in such cases is calculated to excite no sympathy: the law takes its course in peace, and unnoticed. Yet it is the same power, and used in the same manner, as by a master over his slave. The right in such case is from the same source, the law of the land. If the enforcement of the right excites more feeling in one case than the other, it is not from the manner in which it is done, but the nature of the right which is enforced, property in a human being for life. If this is unjust and oppressive, the sin is on the makers of laws which tolerate slavery: to visit it on those, who have honestly acquired, and lawfully hold property under the guarantee and protection of the laws, is the worst of all oppression, and the rankest injustice towards our fellow men. It is the indulgence of a spirit of persecution against our neighbors, for no offence against society or its laws, but simply for the assertion of their own in a lawful manner." "If this spirit pervades the country," he goes on to say: "if public opinion is suffered to prostrate the laws which protect one species of property, those who lead the crusade against slavery, may at no distant day find a new one directed against their lands, their stores, and their debts. If a master cannot retain the custody of his slave, apprentice, or redemptioner, a parent must give up the guardianship of his children, bail have no hold upon their principal, the creditor cannot arrest his debtor by lawful means, and he, who keeps the rightful owner of lands or chattels out of possession, will be protected in his trespasses. When

the law ceases to be the test of right and remedy; when individuals undertake to be its administrators, by rules of their own adoption; the bands of society are broken as effectually by the severance of one link from the chain of justice which binds man to the laws, as if the whole was dissolved. The more specious and seductive the pretexts are, under which the law is violated, the greater ought to be the vigilance of courts and juries in their detection. Public opinion is a security against acts of open and avowed infringements of acknowledged rights; from such combinations there is no danger; they will fall by their own violence, as the blast expends its force by its own fury. The only permanent danger is in the indulgence of the humane and benevolent feelings of our nature, at what we feel to be acts of oppression towards human beings, endowed with the same qualities and attributes as ourselves, and brought into being by the same power which created us all; without reflecting, that in suffering these feelings to come into action against rights secured by the laws, we forget the first duty of citizens of a government of laws, obedience to its ordinances."

There was one other legal proposition affirmed in the opinion of this court, but it cannot need argument. It was, that the question, whether the negroes were or were not freed by their arrival in Pennsylvania, was irrelevant to the issue; inasmuch as whether they were freed or not, they were equally under the protection of the law, and the same obligation rested on Mr. Williamson to make a true and full return to the writ of habeas corpus. Simple and obvious as this proposition is, it covers all the judicial action in the case. The writ required him to produce the negroes, that the court might pass upon his legal right to carry them off or detain them. What questions might arise afterwards, or how they might be determined, was not for him to consider. His duty then, as now, was and is to bring in the bodies; or, if they had passed beyond his control, to declare under oath or affirmation, so far as he knew, what had become of them. And from this duty, or from the constraint that seeks to enforce it, there can be no escape. See the argument of Sergeant Glynn, and the remarks of Mr. Justice Gould, Wilkes' Case, 2 Wils. 154.

The application immediately before me, hardly calls for these expanded remarks; though, rightly considered, they bear upon most of the points that were elaborated in the argument upon the question of its reception. It purports to be a suggestion and petition from a person now in Massachusetts, who informs the court that she is one of the negroes who escaped from Mr. Wheeler, that she did so by Mr. Williamson's counsel, and with the sanction of his presence and approval, but that he never detained her, nor has any one since, and that she has never authorized an application for the writ of habeas

corpus in her behalf. Thereupon, she presents to me certain reasons, founded as she supposes in law, wherefore I ought to quash the writ heretofore issued at the relation of Mr. Wheeler. When application was made to me for leave to file this paper, I invited the learned counsel to advise me upon the question, whether I could lawfully admit the intervention of their client. My thanks are due to them for the ability and courteous bearing with which they have discussed it. But I remain unconvinced. The very name of the person who authenticates the paper is a stranger to any proceeding that is or has been before me.[3] She asks no judicial action for herself, and does not profess to have any right to solicit action in behalf of another: on the contrary, her counsel here assure me expressly, that Mr. Williamson has not sanctioned her application. She has therefore no status whatever in this court. Were she here as a party, to abide its action, she would have a right to be heard according to the forms of law; were she here as a witness, called by a party, her identity ascertained, she might be examined as to all facts supposed to be within her knowledge. But our records cannot be opened to every stranger who volunteers to us a suggestion, as to what may have been our errors, and how we may repair them. I know that the writ of habeas corpus can only be invoked by the party who is restrained of liberty, or by some one in his behalf. I know, too, that it has been the reproach of the English courts, that they have too sternly exacted proof, that the application was authorized by the aggrieved party, before permitting the writ to issue. But, as yet, the courts of the United States have, I think, avoided this error. The writ issues here, as it did in Rome,[4] whenever it is shown by affidavit that its beneficent agency is needed. It would lose its best efficiency, if it could not issue without a petition from the party himself, or some one whom he had delegated to represent him. His very presence in court to demand the writ would, in some sort, negative the restraint which his petition must allege. In the most urgent cases, those in which delay would be disastrous, forcible abduction, secret imprisonment, and the like, the very grievance under which he is suffering, precludes the possibility of his applying in person or constituting a representative. The American books are full of cases,—they are within the experience of every practitioner at the bar,—in which the writ has issued at the instance of third persons, who had no other interest or right in the matter than what every man concedes to sympathy with the oppressed. I need only to refer to the case I have quoted from.—U. S. v. Green [Case No. 15,256],—and the Case

---

[3] Neither the petition for the writ of habeas corpus, nor the writ itself, names Jane Johnson.

[4] "Interdictum omnibus competit—Nemo enim prohibendus est libertati favere."—Dig. bk. 43, tit. 29, § 9.

of Stacy, 10 Johns. 328, for illustrations of this practice. Of course, if it appears to the court at any time, that the writ was asked for by an intermeddling stranger, one who had no authority to intervene, and whose intervention is repudiated, the writ will be quashed. But it is for the defendant, to whom the writ is addressed, to allege a want of authority in the relator. The motion to quash cannot be the act of a volunteer. Still less can it come to us by written suggestion, from without our jurisdiction, in the name of the party who is alleged to be under constraint, and whose very denial that she is so may be only a proof that the constraint is effectual. I may add, that I have examined all the authorities which were brought before me by the learned counsel: with most of them I was familiar before. But there is not one among them, which in my judgment conflicts with the views I have expressed. The application to enter this paper among the records of the court, must therefore be refused.

Upon the reading of the above opinion, Mr. Cadwalader, as a member of the bar of the court not counsel or attorney in the original or subsequent proceedings, asked leave as amicus curiæ to suggest that, in the opinion of the court, an incident of the original proceeding, which has been publicly misrepresented, was not noticed. "It has been publicly reported," Mr. Cadwalader said, "that after the opinion of the court, which resulted in Mr. Williamson's commitment, had been read, his counsel applied to the court for leave to amend his return, which leave was refused. The present suggestion is made under the belief of the member of the bar who makes it, that this report was erroneous, and that what occurred was as follows. When the opinion in the original proceeding was read, the counsel of Mr. Williamson asked if a motion to amend the return would be received, and the court replied, that the motion must be reduced to writing, and that it could not be received until the court's order should be filed with the clerk and recorded; adding that the court would then receive any motion which the counsel for Mr. Williamson might desire to make. The court's order was then filed by the clerk, and entered on record; but no motion to amend was then or afterwards made, although the court paused to give an opportunity for making it, and invited the counsel then or afterwards, to make any motion which their client might be advised to make."

KANE, District Judge, said: The recollections of Mr. Cadwalader concur substantially with my own. There certainly was no motion made by the counsel of Mr. Williamson, for leave to amend his return. A wish was expressed to make such a motion, and the judge asked that the motion might be reduced to writing and filed. But the motion was not drawn out or presented for the

court's consideration, and the court never expressed any purpose to overrule such a motion, if one should be presented.

[Vide Williamson s Case, 2 Casey [26 Pa. St.] 9; Williamson v. Lewis, 3 Wright [39 Pa. St.] 9.] [5]